**THE FUND FOR ANIMALS, INC., et al., Plaintiffs,**

v.

**Michael ESPY, Secretary of the United States Department of Agriculture,[1] Defendant.**

**Civ. A. No. 93–0360–LFO.**

United States District Court, District of Columbia.

Feb. 24, 1993.

---

**1.** Substituted as Defendant by Order of February 22, 1993.

Eric R. Glitzenstein, Katherine A. Meyer, Harmon, Curran, Gallaher & Spielberg, Washington, DC, for plaintiffs.

Charles W. Findlay, Thomas Halkowski, Environment & Natural Resources Div., Dept. of Justice, Washington, DC, (Thomas E. Bundy, Office of Gen. Counsel, U.S. Dept. of Agriculture, of counsel), for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiffs in this action challenge a February 18, 1993 decision of defendant to fund, approve, and implement a research program involving the capture (on or before February 28, 1993) of 10 to 60 pregnant wild bison from just outside the boundary of their habitat, Yellowstone National Park, their transportation by truck 2000 miles to Texas, their artificial infection with the microorganism brucella, their corralling in Texas with cattle, and, after a few months of study, their slaughter. Plaintiffs contend that defendant's action violated the National Environmental Policy Act (NEPA), 42 U.S.C.

§§ 4321 *et seq.*, and regulations under the Act.

Since defendant has indicated that it must act before February 28, 1993, plaintiffs moved for preliminary relief. A February 19, 1993 Order granted plaintiffs' motion for a temporary restraining order pending further order of the Court. That Order enjoined defendant "to take all necessary steps to maintain in *status quo ante* any bison selected by defendant, or any entity or person acting in concert with it, for its research plan...." During a February 22, 1993 hearing, the parties agreed, and it was ordered, that plaintiffs' motion for a temporary restraining order would be treated as a motion for a preliminary injunction in order to facilitate appellate review of any ruling on the motion in the limited time allowed by the circumstances here. For reasons stated below, an accompanying Order grants that motion.

## I.  FINDINGS OF FACT

It is likely that at a trial on the merits plaintiffs will prove by a preponderance of the evidence the following:

Plaintiffs are the Fund for Animals, Inc., a non-profit membership organization committed to the preservation of animal species in their natural habitats, and four individuals who reside near Yellowstone National Park. According to the verified complaint, members of the Fund have traveled and will continue to travel to the Park "to observe, photograph, protect, and otherwise enjoy the bison in its natural habitat." Complaint at ¶ 4. The Fund alleges that defendant's failure to comply with NEPA "injures the Fund and its members by depriving them of crucial information and input regarding the project, and by reducing opportunities by Fund members to observe, photograph, and otherwise enjoy bison in their natural habitat." *Id.* Plaintiff Tom Skeele alleges that he "enjoys observing bison" in and around Yellowstone and that "[h]e has financially benefitted from the bison and other wildlife in Yellowstone because he conducts environmental education workshops for high school students." *Id.* at ¶ 5. The verified complaint further alleges that plaintiff Skeele's "ability to obtain cru-

cial information about USDA's project, which he could in turn convey to his students during his workshops, is impaired by USDA's failure to comply with NEPA." *Id.* Plaintiff Janice Dunbar alleges that her "ability to enjoy the bison and to appreciate their role in the ecological functioning of the Park will be impaired" by the proposed research project, and that the project "will also cause great emotional distress to Ms. Dunbar and diminish the quality of her experiences when visiting Yellowstone National Park." *Id.* at ¶ 6. Plaintiffs R.J. and Sandy Moulton allege that they "enjoy observing bison both inside and outside of the Park, and they believe that the bison greatly enrich the character and aesthetic diversity of the West Yellowstone region." *Id.* at ¶ 7. The complaint alleges that the Moultons' "ability to enjoy the bison and surrounding areas will be impaired as a result of USDA's approval of the capture and killing of Yellowstone bison." *Id.*

The last remaining wild herd of 2400 bison exists in Yellowstone National Park. In recent years, some bison have migrated during the winter to areas in Montana outside the Park. Ranchers in Montana have expressed concern that the bison may be contaminating cattle with the microorganism known as brucella. Scientists agree that the route of transmission of the brucella organism among bison is from mother to calf during pregnancy, birth, or nursing. While there are no confirmed instances of cattle contamination by free-ranging bison, the cattle industry is very important in Montana. In 1984 the State of Montana, with considerable effort and expense, obtained certification as a brucellosis-free state. The state and its people are justly proud of this achievement, and Montana's freedom from brucellosis infection is of great value to its cattle industry.

At least as early as 1990, Federal and State of Montana officials began cooperating on plans for bison management pending the completion of an environmental impact statement (EIS) by Federal officials. *See Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1395 (9th Cir.1992). In February 1992, the State of Montana and Federal officials agreed to an "Interim Bison Management

Operating Plan," the primary objective of which is "to mitigate or eliminate the potential spread of brucellosis to domestic cattle." Pl.Ex. E, at 1. To achieve this objective, Montana officials, with some federal assistance and (after hotly contested litigation) the approval of the Court of Appeals for the Ninth Circuit, have, over the last several years, slaughtered numerous bison that have wandered out of Yellowstone National Park onto adjoining private and state lands. Pl. Ex. B, at 1.

In August 1992, researchers from Texas A & M University submitted a request to the United States Department of Agriculture (USDA) for $94,000 in federal funds to conduct research on a large number of "live captured bison of YNP [Yellowstone National Park] origin held under controlled experimental conditions." Pl.Ex. G, at 3. The proposal contemplates the capture of up to 60 free-roaming, wild pregnant bison in Montana and their transportation by truck approximately 2000 miles to Texas. There, half of them would be artificially infected with the brucella organism and corralled in close proximity to cattle for a period of time.[2] Researchers at Texas A & M then propose to determine whether the infected bison abort as a result of contamination with brucellosis, and whether the infection would be transmitted to cattle upon direct contact with the aborted tissue. Id. at 3–4. After the study, the infected bison would be slaughtered because they would be, according to the research proposal, "a potential health hazard to domestic livestock." Id. at 3. The research proposal states, among other things, that it is designed to respond to "untested hypotheses" in "newspaper articles" and "court testimony" that "Brucella induced abortions are extremely rare to nonexistent in YNP bison" and that "large numbers of Brucella infected YNP bison could come into close proximity to susceptible cattle 'without any risk' of trans-

mission...." Id. at 2. The proposal further states:

> If there is not solid research data to confirm or confront the unfounded "beliefs" and assertions resulting from the untested hypotheses, the courts (and others) may agree with the animal activists [sic] groups and this would severely impair or obstruct the present Federal/State Cooperative Brucellosis Eradication Program.

Id.

Plaintiffs have filed statements by credentialed scientists severely criticizing the Texas A & M research proposal. Dr. Mary Meagher, an animal ecologist with the National Park Service who has studied Yellowstone bison for 27 years, stated in an October 15, 1992 letter to the USDA that she was "troubled" by the proposal's ostensible purpose of responding to "simplifications and misstatements" in "newspaper articles." Pl.Ex. H. She opined that the "proposal appears fundamentally flawed" because a "controlled test such as proposed here unavoidably alters all the ecological parameters, and therefore, cannot tell us how the [brucella] organism functions in this particular situation." Id. Dr. Meagher "strongly" suggested

> that this approach be canceled. It seems less than humane to put wild bison through all the stress necessary to obtain experimental animals for a proposal that cannot furnish information useful for the specific Yellowstone situation.

Id. (emphasis added).

Dr. Margaret E. Meyer, a Professor Emeritus at the University of California, Davis, and one of the leading authorities on brucellosis infection in the Yellowstone bison herd, has vigorously criticized the proposal's methodology.[3] In an April 27, 1992 letter to the USDA, she expressed "shock[ ]" that the researchers had "submitted unsubstantiated

---

2. The half not infected would be observed in order to compare the incidence of abortion by them with its incidence in the infected bison. Pl.Ex. G, at 2–3. It is not clear from the record whether this group would be slaughtered following the study.

3. Dr. Meyer's 22–page curriculum vitae reveals a doctorate in comparative pathology from the

University of California at Davis, 88 publications (the majority focused on the brucella organism), several professional awards including one from the National Brucellosis Research Conference for contributions to brucellosis research, and tenured university appointments in microbiology and veterinary public health. Compare infra note 7.

comments from newspaper clippings ... as justification for research funding." Pl.Ex. F, at Attach. 2. In her affidavit, Dr. Meyer described the research proposal as "completely unfounded," and the methodology as "seriously flawed in several glaring respects that appear to be calculated to achieve the preconceived result." Pl.Ex. F, at ¶ 6; *see also* Pl.Ex. P, at ¶ 4 (affidavit of Dr. Dirk Van Duren) ("it is clear that the authors are planning this research with one outcome in mind: *to gather data that support the brucellosis-eradication program*").

Defendant offers evidence that, before approval of the research, all comments received, including those of Dr. Meagher and Dr. Meyer, were reviewed at USDA and that copies of the research proposal were sent to the Advisory Committee of the U.S. Animal Health Association and the Greater Yellowstone Area Brucellosis Technical Committee. Luchsinger Decl., at ¶¶ 7–8. According to the defendant, these two groups, the latter of which includes representation from the National Park Service, support the research. *Id.*

In a December 16, 1992 letter, the USDA's Deputy Administrator of Veterinary Service informed the Yellowstone National Park Superintendent that the USDA had decided to "provid[e] a grant to the Texas A & M University (TAMU) to perform a research project on bison from the Yellowstone National Park." Pl.Ex. I. The USDA requested the Park Service to "authorize" it to "capture" a sufficient number of bison to "end up with sixty (60) head of brucellosis seronegative pregnant bison." The letter also explained that USDA would provide "all necessary facilities," such as "portable testing equipment and portable panels to form an

enclosure to trap (contain) the bison." *Id.* (parenthetical in original).

In a December 29, 1992 response, Robert D. Barbee, the Superintendent of Yellowstone Park, refused to allow bison to be removed from the Park for research. The Superintendent noted that "NPS is bound by the provisions of [NEPA], and this law would require the NPS to conduct an environment assessment or possibly an environmental impact statement (EIS) for a research project such as you propose." Pl.Ex. J. The Superintendent also explained to the USDA that Federal and state agencies were in the process of preparing a "long-term bison management plan and EIS" that will discuss "alternatives that will address and provide for research of the magnitude that you propose." Finally, he stated that the EIS was projected for completion by January 1994.

Thereafter, nevertheless, the USDA decided to proceed with the research project, but modified it to provide for the taking of only bison that wandered (or were attracted) onto lands adjacent to Yellowstone Park rather than bison in Yellowstone itself. On February 18, 1993, the USDA Deputy Administrator for Veterinary Services granted official permission "to move between 10 and 60" pregnant bison from Montana to Texas A & M for the research project. Pl.Ex. L.

Defendant approved the research project without first obtaining either an environmental impact statement (EIS) or an environmental assessment (EA), or making any determination pursuant to the "categorical exclusion" provisions at 7 C.F.R. § 1b.3[4] that neither an EIS nor an EA was required under NEPA.

---

4. That section provides:
   (a) The following are categories of activities which have been determined not to have a significant individual or cumulative effect on the human environment and are excluded from the preparation of environmental assessment (EA's) or environmental impact statements (EIS's), unless individual agency procedures prescribed otherwise.
   ....
   (3) Inventories, research activities, and studies, *such as* resource inventories and routine data collection when such actions are clearly limited in context and intensity....

(b) Agencies will identify in their own procedures the activities which normally would not require an environmental assessment or environmental impact statement.
(c) Notwithstanding the exclusions listed above and in § 1b.4, or identified in agency procedures, agency heads may determine that circumstances dictate the need for preparation of an EA or EIS for a particular action. Agencies shall continue to scrutinize their activities to determine continued eligibility for categorical exclusion.
7 C.F.R. § 1b.3.

Plaintiffs presented evidence tending to show that pursuant to the project plan so approved, bison are being attracted to a project study site located approximately one mile from the boundary of Yellowstone Park. The Texas A & M research proposal itself states that the plan for capture of the bison includes "the use of 'baited' portable traps and pens." [5]  Pl.Ex. G, at 5.

According to the affidavit of Susan Newman, a nearby resident, since late January 1993 roads in the site area have been plowed, and feed (hay) has been placed along the roads and at the pen location. Pl.Ex. N., at ¶¶ 3–9.

Dr. Allen T. Rutberg, a senior scientist for the Humane Society of the United States, stated in an affidavit that "providing hay to bison outside Yellowstone National Park is likely to increase the number of bison that leave the park, and to keep bison out of the park for longer periods." Pl.Ex. O, at ¶ 8. He also stated that "road-plowing and other snow-removal activities ... carried out in connection with the construction of corrals and provision of hay at a trap site outside Yellowstone National Park ... will facilitate the movement of bison, elk, and other wildlife outside Yellowstone Park." *Id.* at ¶ 10.

Finally, the affidavit of Donald J. Schubert, Director of Investigations for the plaintiff Fund, provided further, albeit circumstantial, evidence of a "baiting" effect as a result of the research program. Mr. Schubert stated:

Based on information I have received from Montana state officials, it is my understanding that, during the winter of 1991/1992, approximately 15–20 bison were killed by state officials on private land near West Yellowstone, Montana, and that during the winter of 1990/1991, approximately 11 bison were killed by state officials on public and private land near West Yellowstone, Montana.

On February 20, 1993, Stuart MacDonald, USDA/APHIS spokesperson for the proposed USDA/APHIS research project, informed me that, during the week of February 15–February 20, 1993, 70–80 bi-

son were "processed" at the capture site for the Texas A & M research project. He further informed me that only 5 of these bison met the criteria for the study.

Pl.Ex. T, at ¶¶ 2–3.

On the basis of all the available evidence at the present juncture, it is more likely than not likely that some number of bison from Yellowstone are being "baited"—i.e., some number of bison that would not otherwise have departed from Yellowstone Park are being drawn toward the site for the capture of specimens for the USDA-sponsored project. There is no evidence in the record that the USDA gave consideration to the facts established by Ms. Newman, Dr. Rutberg, and Mr. Schubert, or the reasonable inference therefrom that the project is attracting a number of bison that would not otherwise leave the protected park and facilitating their destruction either by Montana or for the disputed program.

Plaintiffs offered other evidence that the capture of the bison, their transportation to Texas, and their handling and destruction there as called for by the research proposal would be "less than humane." Pl.Ex. H, at 2. (Letter from Dr. Meagher to John D. Kopec, D.V.M. and Donald S. Davis, Ph.D.) Dr. Meyer stated:

[T]he adverse impacts on the Yellowstone bison will be extreme. The bison will be subjected to extraordinarily stressful conditions—they will be rounded up and placed on trucks, they will be infected with *B. abortus,* they will be forced to abort calves in the late stages of pregnancy, and they will subsequently be killed. In light of the utter baseless purpose of the project, such adverse impacts cannot be justified.

Pl.Ex. F, at ¶ 8.  According to the affidavit of Dr. Jay F. Kirkpatrick, "Bison are extremely social animals and just the separations from companions will cause stress, not to mention the trip itself." Pl.Ex. Q, at ¶ 2A; *accord* Pl.Ex. P, at ¶ 11 (affidavit of Dr. Van Du-

---

5. It is uncontroverted that the Montana state brucellosis eradication program is assisted by "shooters" engaged by the National Park Service.

ren).[6] Defendant's principal response to the foregoing opinions is the declaration of Dr. Donald Luchsinger, Associate Deputy Administrator of the USDA's Veterinary Services.[7] It states that Texas A & M has found bison to "haul very well" and that only six of 400 bison have been lost in the capture-and-transportation process. Luchsinger Decl., at ¶ 6. Defendant does not, however, traverse plaintiffs' evidence of the adverse impacts upon the bison other than their "haulability."

It is undisputed that the USDA did not conduct an environmental assessment (EA) or an environmental impact statement (EIS) in connection with the Texas A & M research project, or make any timely determination that the project was exempt from these requirements pursuant to the "categorical exclusion" provisions of the controlling regulation, 7 C.F.R. § 1b.3.

## II. CONCLUSIONS OF LAW

While the answer to the issue with respect to the alleged violation of NEPA is relatively straightforward, the issues with respect to standing, and the general requirement that an applicant for a preliminary injunction demonstrate a threat of irreparable injury which will outweigh the detriment to be incurred by the defendant and the public interest if the threatened action is enjoined, are not free from doubt.

### A.

■ The issue of standing implicates the jurisdiction of this Court under Article III of the Constitution and must be considered first. In order to have standing to sue, a plaintiff must demonstrate a threat of concrete injury that is fairly traceable to the defendant's conduct. *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Plaintiffs are a national wildlife protection organization and several individuals living in the immediate vicinity of the study site. They allege two distinct categories of injury.

■ First, plaintiffs contend that they have experienced a "procedural injury" by virtue of defendant's violation of NEPA, specifically his failure to obtain any environmental impact statement (EIS) or environmental assessment (EA) or determine whether the project was exempt from those requirements by the categorical exclusion of 7 C.F.R. § 1b.3. The fundamental purpose of NEPA is to "help public officials make decisions that are based on understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." 40 C.F.R. § 1500.1(c). NEPA sets forth procedural requirements designed to meet this objective, including the requirement that agencies prepare a "detailed statement" regarding "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). NEPA requires the preparation of a full-fledged EIS or, "in any proposal which involves unresolved conflicts concerning alternative uses of available resources," an EA. 42 U.S.C. § 4332(E). Under the regulations promulgated pursuant to NEPA, an EA "shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of the environmental impacts of the proposed action, and alternatives, and a listing of agencies and persons consulted." 40 C.F.R. § 1509.9(b). In addition, a Federal agency "shall involve ... the public, to the extent practicable, in preparing [EAs]" and "shall make the [accompanying] finding of no significant impact [FONSI] available to the affected public." 40 C.F.R. § 1501.4(b), (a)(1).[8]

---

**6.** "YNP bison have never been exposed to fencing and, especially, close confinement. Bison are notoriously difficult to control and handle when treated in the same manner as are cattle. I would not be surprised if substantial numbers of YNP bison died en route to Texas."

**7.** Dr. Luchsinger submitted no curriculum vitae. His declaration reports that, in addition to his present occupation, he has previously served as USDA Director of Operational Support Staffs for two years, and, prior to that position, as Director of the Foreign Animal Disease Diagnostic Laboratory on Plum Island, New York. *Compare supra* note 3.

**8.** The Council on Environmental Quality (CEQ), an agency created by NEPA, has also advised Federal agencies that public comment on EAs and FONSIs is essential in a number of circumstances, including where it is an unusual case

The sole exception to the requirements of preparing an EA or an EIS is provided in the "categorical exclusion" provisions, 7 C.F.R. § 1b.3, set out *supra* at note 4. As discussed below, defendant contends that a categorical exclusion applies in this case. However, the record reveals no contemporaneous consideration by the administrative decisionmaker of the applicability of a categorical exclusion. Plaintiffs argue that the mere violation of NEPA's procedural requirements constitutes a cognizable injury sufficient to support their standing to sue here.

The adequacy of plaintiffs' "procedural injury" alone to establish standing is brought into serious doubt by the Supreme Court's decision in *Lujan v. Defenders of Wildlife,* — U.S. —, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). There the Court, considering the Endangered Species Act of 1973, held that a plaintiff's bare interest in the government's compliance with the procedural requirements of a statute was insufficient to confer standing under Article III. *Id.* at —, 112 S.Ct. at 2143–26. Instead, the Court concluded, a plaintiff must show that "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.* at — n. 8, 112 S.Ct. at 2143 n. 8. Plaintiffs contend that *Defenders of Wildlife* is distinguishable because the entire fabric of NEPA is fundamentally procedural, and the Act would be rendered impotent in the absence of plaintiffs' standing premised on "mere" procedural injury. There is some appeal to plaintiffs' argument, but the fact remains that the Court's holding in *Defenders of Wildlife* was based on the requirements of *the Constitution,* so it would appear that the particular statute alone cannot cure such a defect.

However, plaintiffs here meet the stricter standing requirements of *Defenders of Wildlife.* Fund for Animals, Inc. is an established charitable and scientific organization committed to preserving animal species in their natural habitats, and to preventing the abuse of both wild and domestic animals. Its standing to bring a suit involving the preservation of Yellowstone bison and their protection from inhumane treatment was expressly

recognized by the Court of Appeals for the Ninth Circuit in *Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1395–96 (9th Cir.1992). That Court concluded:

> [T]he Fund's members had standing to sue because of the psychological injury they suffered from viewing the killing of the bison in Montana. Mr. Pacelle testified that several Fund members had been emotionally harmed when they saw bison "who were just standing outside the boundary of park shot and crumbled [sic] to their feet."
> ... The distress experienced by Fund members viewing bison being killed is distinct from that suffered by the public at large. Fund members, who presumably visit national parks and forests to view free-roaming bison, suffered a psychological injury beyond a generalized concern for the bison's welfare.

*Id.* at 1396–97.

The individual plaintiffs' standing to challenge defendant's failure to make a "categorical exclusion" determination derives from the ultimate facts established by the verified complaint and the undisputed documentary evidence that defendant's approval of the disputed program and the imminent implementation of it threatens the combination of: (1) plaintiffs' procedural right to the notice and reasoned process required of defendant by NEPA; and (2) the concrete, aesthetic viewing interest of the Fund members and of the individual plaintiffs in the Yellowstone bison, particularly those which have been attracted from the wild and threatened with an inhumane process of destruction by, and in aid of, the program. *See Defenders of Wildlife,* — U.S. at — n. 8, 112 S.Ct. at 2143 n. 8. Like the plaintiffs in *Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221, 230–31 n. 4, 106 S.Ct. 2860, 2865–67 n. 4, 92 L.Ed.2d 166 (1986), the Fund members and individual plaintiffs here "undoubtedly have alleged a sufficient 'injury in fact' in that the [animal] watching and studying of their members will be adversely affected by" the baiting, capture, and shipment of the animals from the wild for the uses of the program. Injury to this aesthetic interest of neighbors used to enjoying viewing the bison

and where there is public controversy over the

proposal. 46 Fed.Reg. 18028, 18038.

in the wild is plainly threatened by the viewing, and the prospect of viewing of, the less than humane baiting and capturing of the bison with the knowledge of their destination and fate in aid of this program. *See Humane Soc'y of United States v. Hodel,* 840 F.2d 45, 52–53 (D.C.Cir.1988); *Fund for Animals, Inc. v. Lujan,* 962 F.2d 1391, 1395–96 (9th Cir.1992).

The defendant rests his challenge to the plaintiffs' claims heavily upon the statement in Dr. Luchsinger's declaration that "Montana will continue to eliminate the potential spread of brucellosis from YNP bison to Montana by capturing and sending to slaughter all bison that *wander* into Montana from YNP." Luchsinger Decl., at ¶ 4 (emphasis added). Thus defendant contends, in effect, that the bison of concern to the plaintiffs would be slaughtered by Montana if they were not captured and involved in the project, so that the error complained of is, from the plaintiffs' perspective, harmless and the remedy they seek is futile. However, plaintiffs dispute this factual allegation. Plaintiffs' evidence shows that defendant has been involved in *attracting* bison from Yellowstone to be captured, transported, infected, and destroyed, which, but for the project, would not otherwise be captured either for slaughter by Montana or for the research project. This finding is supported by the evidence of the difference between the 11 bison killed in the winter of 1990–91, the 15 or 20 killed in the winter of 1991–92, and the 70 or so captured from February 15 to February 20, 1993 while the Texas A & M project was getting underway. This finding is further corroborated by the affidavits about the recent *concentration of the corrals,* plowed roads, and hay. All of this supports a strong inference that, but for the program, many bison, now attracted from Yellowstone and captured by Montana for slaughter or for the program, would remain in the wild. These findings support the conclusion that the error committed by defendant is not harmless, that the remedy plaintiffs seek is not futile, and that defendant's contentions to that effect do not oust plaintiffs' standing here.

**B.**

The determination as to whether preliminary injunctive relief is appropriate is guided by four factors: (1) likelihood of success on the merits; (2) irreparable harm to the moving party; (3) harm to the nonmoving party; and (4) the public interest. *Sea Containers Ltd. v. Stena AB,* 890 F.2d 1205, 1208 (D.C.Cir.1989).

**(1)**

█ Plaintiffs have shown a likelihood of success on the merits. They have demonstrated by the undisputed evidence that defendant is likely violating the law. He has authorized a study which is arguably detrimental to the environment of Yellowstone National Park and its vicinity without conducting either an EIS or an EA, and without making a determination that the program is entitled to a categorical exclusion.

Defendant's sole attempt at justification for the apparent lack of consideration of the environmental effects of the proposal is a citation to one of the "categorical exclusions" exempted from the EIS/EA requirement under 40 C.F.R. § 1501.4(a) & (b). Defendant relies on the following exclusion applicable to USDA actions:

> Inventories, research activities, and studies, such as resource inventories and routine data collection when such actions are clearly limited in context and intensity.

7 C.F.R. § 1b.3(a)(3). This exclusion is apparently the only one that arguably applies to defendant's challenged action. However, the exclusion is unlikely to withstand scrutiny. The unique proposal here is neither a mere "resource inventor[y]" nor a "routine [9] data collection"; nor does it appear to be an action "*clearly limited* in context and intensity." *Id.* (emphasis added). Since the defendant is not likely to establish that the exclusion applies, defendant will likely be found to have violated NEPA by failing to conduct at least an EA, not to mention failing

---

**9.** Webster's Third New International Dictionary defines "routine" as "of a commonplace or repe-

titious character; ordinary, usual."

to ensure public participation in the assessment.

Dispositive here, however, is the virtual admission of counsel for the defendant that neither defendant nor any authorized subordinate made any contemporaneous determination as to whether the study falls within or without a categorical exclusion under 7 C.F.R. § 1b.3, or that either an EIS or an EA (one or the other of which is required in the absence of a categorical exclusion) should be prepared. Invocation of the categorical exclusion for the first time by counsel after the complaint was filed in this case appears to be a *post hoc* rationalization, and is inadequate as a basis for review. *Doraiswamy v. Secretary of Labor*, 555 F.2d 832, 840 (D.C.Cir.1976); *see also AT & T Information Systems v. General Services Admin.*, 810 F.2d 1233, 1236 (D.C.Cir.1987); *National Trustee for Historic Preservation v. Dole*, 828 F.2d 776, 781 (D.C.Cir.1987).

In sum, plaintiffs will likely prevail on their claim that defendant completely failed to comply with NEPA.

(2)

■ There remains the question of plaintiffs' irreparable injury. As noted previously, plaintiffs are threatened with concrete, aesthetic, as well as procedural, injury.

The individual plaintiffs live near Yellowstone National Park and frequent it. It is likely that the evidence on the merits will show, and it is a reasonable inference from the evidence now in the record, that the plaintiffs know the history of the bison from its prevalence in the American West to its near extinction and the public interest in preservation of the species and the Yellowstone herd. Each of them enjoys the neighboring Yellowstone bison in much the same way as a pet owner enjoys a pet, so that the sight, or even the contemplation, of treatment in the manner contemplated of the wild bison, which they enjoy and have seen and

are likely to see captured for the program, would inflict aesthetic injury upon the individual plaintiffs and Fund members in the nature of that recognized by the Ninth Circuit in *Fund for Animals v. Lujan* and our Court of Appeals in *Humane Soc'y v. Hodel*. Such injury is not compensable in money damages because, while the injury threatened to these plaintiffs' aesthetic interests would be palpable and concrete, they are not ownership interests in property susceptible to monetary valuation. In addition, most states (if not all) deny damage awards for pain and suffering not accompanied by physical injury. Nor can money damages compensate plaintiffs' procedural injury caused by defendant's NEPA violation.[10] Thus, the injury experienced and threatened would be irreparable.

(3)

■ Finally, defendant argues that the requested injunction would cause serious injury to both defendant and the public interest which outweighs the plaintiffs' interests. As defendant points out, if the proposed research is delayed beyond February 28, 1993, it would have to be postponed for at least a year, with no guarantee that funding would be available at that time. Time is of the essence because the research relies on the selection of bison before they are eight months pregnant, and the breeding season is annual. Luchsinger Decl., at ¶ 10.

Brucellosis is a serious problem in Montana and brucellosis research is important. As the Ninth Circuit has recognized:

Montana has spent 30 million dollars to eradicate brucellosis in its cattle herds. [Its] "brucellosis free" status allows Montana to export cattle without testing. A loss of its "brucellosis free" designation would require Montana to spend over two million dollars a year for the testing of its cattle.

---

10. As explained above, the purpose of NEPA is to insure that Federal decisionmakers give adequate consideration to the environmental effects of their actions and to involve the public in such consideration. The harm of defendant's failure to do so is also a harm that is serious—and obviously irreparable once the contemplated action becomes a *fait accompli*. Although the

Court in *Defenders of Wildlife* concluded that such a "procedural injury" did not, *by itself*, confer standing under Article III, it made clear that plaintiffs "assuredly can" enforce procedural rights, so long as there is also an underlying concrete injury that serves as the ultimate basis for Constitutional standing. —— U.S. at —— n. 8, 112 S.Ct. at 2143 n. 8.

*Fund for Animals, Inc. v. Lujan,* 962 F.2d at 1401–02. In light of the undeniable public interest in valid brucellosis research, this case presents an extremely difficult balance between competing values and injuries.

In the end, however, a number of considerations weigh in favor of a preliminary injunction. The first is defendant's apparent NEPA violation. Having failed to prepare either an EIS or an EA, the administrative decisionmaker made no determination even that a "categorical exclusion" applied. Thus, a public interest expressed by Congress was frustrated by approval of this proposal, with likely environmental consequences, without NEPA compliance.

Second, the plaintiffs' evidence, which is not materially traversed at this stage, casts doubt on the value of the research project. While judges are not in the best position to evaluate the methodologies and justifications of scientific research, the expert opinions of Dr. Meagher, Dr. Meyer, and Dr. Van Duren surely go some distance toward creating serious doubt about the value of the project. Aside from their views on the study's questionable impartiality, these scientists have called into serious question whether the less than humane conditions which would be imposed on up to 60 bison by the research project would sufficiently replicate conditions of pregnant and calving bison in the wild to provide a basis for useful findings. Moreover, the concerns raised by these scientists go to the environmental conditions of the bison, further highlighting the problem of defendant's failure to give the focused consideration to these issues required of him by NEPA.

Third, the interests of the defendant and the public in forthwith implementation of the disputed program is seriously diluted by the pendency and relative imminence of the joint Interior Department EIS to which the Superintendent of Yellowstone alerted defendant. That EIS, which is scheduled to be completed in 1994, will likely identify, in ample time for the public interest, options for studies in an environment more analogous to the Yellowstone wild and more acceptable to scientists than the proposal at issue here.

Finally, there is a strong public interest in meticulous compliance with the law by public officials. As Justice Jackson sagely observed many years ago:

> It is very well to say that those who deal with the Government should turn square corners. But there is no reason why the square corners should constitute a one-way street.

*Federal Crop. Ins. Corp. v. Merrill,* 332 U.S. 380, 387–88, 68 S.Ct. 1, 45, 92 L.Ed. 10 (1947) (Jackson, J., dissenting). Indeed, the Constitution itself declares a prime public interest that the President and, by necessary inference, his appointees in the Executive Branch "take Care that the Laws be faithfully executed." Const. Art. II, § 3.

For the foregoing reasons, in the final analysis, the balance of equities weighs in favor plaintiffs' requested preliminary relief.