FRIENDS OF THE PAYETTE, and
Idaho Rivers United, Inc.,
Plaintiffs-Appellants,

v.

HORSESHOE BEND HYDROELECTRIC
CO.; United States Army Corps of Engineers; Robert Volz, District Engineer
of United States Army Corps of Engineers, Defendants-Appellees.

No. 92-36611.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 5, 1993.

Decided March 19, 1993.

Jim Jones, Boise, ID, for plaintiffs-appellants.

D. Marc Haws, Asst. U.S. Atty., Boise, ID, David P. Hirschi, Salt Lake City, UT, for defendants-appellees.

Before: WRIGHT, Senior Circuit Judge, and FARRIS and KLEINFELD, Circuit Judges.

EUGENE A. WRIGHT, Senior Circuit Judge:

Two environmental groups allege that the Army Corps of Engineers violated the National Environmental Policy Act by issuing a dredge-and-fill permit for a hydroelectric project without preparing an environmental impact statement. Because we conclude that the Corps' action was not arbitrary and capricious, we affirm the district court's dismissal of the action.

I

On March 10, 1992, the Horseshoe Bend Hydroelectric Company began construction of a 9.5–megawatt hydroelectric generating facility on the Payette River near Horseshoe Bend, Idaho. When completed, the facility will work as follows: An inflatable

bladder diversion dam will divert up to 3,500 cubic feet of water per second from a four-and-a-half-mile stretch of the river, routing the water down a diversion canal to a power house. The water will then pass over the powerhouse turbines before returning to the river. A minimum flow of 400 cfs will remain in the river channel, also known as the bypass stretch.

The facility is being built at the site of a decommissioned run-of-the-river hydroelectric project, which operated from 1902 to 1954. The new project will expand and use the old project's diversion canal, which had contained valuable wetlands. Project construction has almost completely destroyed those wetlands.

Before starting construction, HBHC and its predecessor in interest, the Boise Cascade Corporation, had to obtain the approval of several state and federal agencies. In July 1986, the Federal Energy Regulatory Commission issued a license for the project to Boise Cascade. Before doing so, FERC prepared an environmental assessment in August 1984 and a supplemental EA in April 1986. Both concluded that the project would not significantly affect the environment. In April 1987, FERC approved Boise Cascade's transfer of its license to HBHC.

HBHC then obtained the necessary state permits allowing it to appropriate water from the river, gain construction access to state-owned lands and build the dam. Lastly, HBHC needed to secure a dredge-and-fill permit from the Army Corps of Engineers. The permit, required by section 404 of the Clean Water Act, would allow HBHC to place dredged or fill material in the river. *See* 33 U.S.C. § 1344 (1988). HBHC applied for the permit on December 9, 1991. The Corps issued it on March 30, 1992. Although interested parties requested a public hearing, the Corps did not hold one.

Like FERC, the Corps found that the project would not significantly impact the environment within the meaning of the National Environmental Policy Act. Therefore, the agency did not prepare an EIS, but issued instead an EA and a finding of no significant impact. The § 404 permit has 17 conditions designed to mitigate environmental harm.

Friends of the Payette and Idaho Rivers United, Inc., two environmental organizations, filed suit, claiming that the Corps' actions violated NEPA and the Clean Water Act.[1] They sought a declaration that the Corps had not complied with NEPA and the CWA and an injunction halting the project pending preparation of an EIS.

The district court set the case for trial. Because it found that admission of almost all extra-record evidence was unwarranted, however, the court disallowed the testimony of 13 of Payette's 14 proposed witnesses. It reviewed the Corps' actions based solely on the administrative record and the testimony of William McDonald, the Corps employee who prepared the EA. The court dismissed the suit, holding that the Corps' decision was reasonable.

Payette raises four issues on appeal: (1) whether the Corps' failure to prepare an EIS was reasonable, (2) whether the court erred in holding that the agency's jurisdiction over wetlands in the diversion canal was moot, (3) whether the Corps' permit-granting procedure was flawed for failure to allow adequate public comment and (4) whether the court erred by refusing to allow extra-record evidence. Payette also asks for attorneys fees.

## II

### A. *Decision Not to Prepare EIS*

NEPA requires federal agencies to prepare a detailed EIS for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332 (1988). The Corps concedes that the project constitutes a major Federal action. The issue is whether the Corps properly determined that the project will not significantly affect the environment.

**1.** The Idaho Division of Environmental Quality and FERC were defendants. The action against IDEQ was dismissed by stipulation. The district court dismissed FERC after finding that we have exclusive jurisdiction over appeals from FERC decisions.

After the district court's June 1992 order dismissing the action, we adopted a new standard for reviewing an agency's decision not to prepare an EIS. We no longer employ a "reasonableness" standard. In *Greenpeace Action v. Franklin*, 982 F.2d 1342, 1350 (9th Cir. 1992), we held that "when a litigant challenges an agency determination on grounds that, in essence, allege that the agency's 'expert review ... was incomplete, inconclusive, or inaccurate,' ... the arbitrary and capricious standard is appropriate." (quoting *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376–77, 109 S.Ct. 1851, 1860–61, 104 L.Ed.2d 377 (1989)). We still must ensure that an agency has taken a "hard look" at the environmental consequences of its action and that its decision is "founded on a reasoned evaluation 'of the relevant factors.'" *Id.* at 1350 (quoting *Marsh*, 490 U.S. at 378, 109 S.Ct. at 1861). If we are convinced that its discretion is truly informed, however, we must defer to that discretion. *Id.*

Payette cites ten bases for its contention that the Corps' decision not to prepare an EIS was erroneous. We reject the contention, but will discuss each basis in turn.

### 1. Wetlands

■ Payette contends that the Corps erroneously determined that wetlands will not be affected significantly. The Corps concluded that the mitigation measures required by the permit compensated for any adverse impacts.

We can consider the effect of mitigation measures in determining whether preparation of an EIS is necessary. *Friends of Endangered Species, Inc. v. Jantzen,* 760 F.2d 976, 987 (9th Cir.1985). If significant measures are taken to "'mitigate the project's effects,' they need not *completely compensate* for adverse environmental impacts." *Id.* (quoting *Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 860 (9th Cir.1982)).

The Corps verified an environmental consultant's estimate that 69.45 acres of wetlands were within the project area. Without mitigation, 30.99 acres of riparian habitat would be lost. Strategic placement of boulders to raise the river stage and irrigation flows from uphill mitigation lands would reduce the loss to 24.69 acres. To compensate for this loss, the Corps required HBHC to implement a mitigation plan that would create 66.64 acres in new wetlands through use of water channels, grass seeding, and tree and shrub planting. The plan also requires monitoring and supplemental mitigation measures if revegetation goals are not met.

Although the measures may not compensate completely for adverse impacts, they are significant. The Corps' conclusion that wetlands would not be affected significantly was not arbitrary and capricious.

### 2. Water Quality

■ Payette asserts that the Corps relied inappropriately on the Idaho Department of Environmental Quality's certification of compliance with state water quality standards. IDEQ granted the certification after HBHC agreed to implement a three-year water quality monitoring program following project construction. If monitoring indicates violations of state standards, HBHC must adopt a mitigation plan. Payette contends that this after-the-fact monitoring cannot supplant before-the-fact evaluation and discussion of mitigation measures. It argues that the project will have a significant impact on water quality due to a decrease in oxygen and increases in temperature, light penetration and aquatic plant stimulation.

The district court noted that although the Corps cannot know exactly how the project will affect water quality, the Corps had reviewed studies attempting to model project impacts. The Corps' reliance on these studies and on a monitoring program that should identify problems before they become serious is not arbitrary and capricious.

### 3. Fisheries

■ Next, Payette argues that the EA did not adequately consider the project's impact on the fishery in the bypass stretch. The Corps concedes that decreased flows

and power turbines will kill fish and that although the power canal will provide run habitat, it will lack other diversity. The Corps' permit, however, requires mitigation measures to compensate for these losses. These measures include (1) a plan to enhance fish habitat in nearby Shaffer Creek, (2) an improved monitoring plan, and (3) additional mandatory mitigation measures if monitoring shows that the mitigation plan has not achieved acceptable results. The measures were strengthened at the insistence of the Fish and Wildlife Service, which approved the project. The Corps' determination that the project would not significantly affect fisheries was not arbitrary and capricious.

### 4. Endangered Species

■ Payette contends that the Corps did not evaluate the project's impact on the bald eagles that winter in the project area. We disagree. The Corps, in consultation with the FWS, included two permit conditions designed to protect the eagles and their habitat. First, every five years for the life of the project, HBHC must provide the Corps with a report on the status of the riparian cottonwood forest in the project area. The forest provides eagle habitat. If project impacts prevent the forest from maintaining itself naturally, HBHC must plant cottonwood tubelings as required by the Corps. Second, the permit requires that power transmission lines be designed to minimize shock hazard to bald eagles. Also, the EA notes that "eagles would still be able to use other riparian zones along the Payette River in the immediate vicinity for their wintering activities." We find no fault with the Corps' conclusion that the project would not significantly affect endangered species.

### 5. Recreation

■ Payette also contends that the Corps gave insufficient consideration to recreation issues other than those relating to an agreement between HBHC and the Western Wildwater Association. We disagree. Project plans call for these mitigation measures: a boat ramp upstream from the dam, a portage path at the dam, a water bypass for boats and flotation devices and the removal of the diversion bladder to allow jet boats to use the main channel during annual races. In addition, HBHC, in consultation with state resource agencies, will place boulders in the bypass reach to increase the river's width. All of these mitigation measures are significant. The Corps' conclusion that the project would not significantly affect recreational activities was not arbitrary and capricious.

### 6. Aesthetics

■ Payette argues that the Corps did not consider adequately the project's impact on aesthetics, particularly the unsightliness of the reduced water flow in the bypass stretch. Article 29 of HBHC's FERC license requires the company, in consultation with the Idaho Department of Parks and Recreation, to "design the readily visible surface of the project facilities to preserve or enhance the existing visual environment." Pursuant to this requirement, HBHC consultants prepared a "Visual Resources Plan." It calls for revegetation of affected areas with native plant species, installation of troughs to capture runoff for irrigation of replanted areas during droughts, use of earthtones to hide from view the partially-buried powerhouse and grading to restore the natural contours of the landscape. After considering these mitigative measures and the record as a whole, we agree that the Corps did not act arbitrarily and capriciously in determining that the project would not have a significant impact on aesthetics.

### 7. Icing

■ Next, Payette maintains that the Corps did not consider adequately the possibility that water diversion would increase the potential for ice formation, ice jams and flooding. The EA acknowledges that potential ice-jam flooding is a risk in that area of the Payette River. The Corps' hydrology branch, however, evaluated the issue and concluded that the project would not result in an increased flood hazard. Upstream, the dam would trap frazil ice (ice crystals formed in turbulent water) causing

ice formation. Although the ice cover would raise the water surface up to eight feet above the normal winter low water mark, the Corps concluded that no damage would occur because the lowest upstream structure is 12 feet above the mark. Although the reduced flow could increase ice formation downstream, it would cause ice jams only rarely.

### 8. Cumulative Impacts

■ Corps regulations require it to evaluate a project's cumulative impacts. 33 C.F.R. § 320.4(a)(1) (1992). The Corps concluded that the project would not have a substantial cumulative impact on the aquatic environment. In doing so, the Corps relied primarily on FERC's analysis of the impact of past and future hydroelectric projects within the Payette River Basin. That analysis, the sole subject of FERC's supplemental EA, concluded that the project would not contribute to cumulative adverse impacts on important resources. We agree with the district court that the Corps sufficiently considered the project's cumulative impacts.

### 9. Alternatives Analysis

■ Payette also asserts that the Corps' alternatives analysis was inadequate. Section 404(b)(1) guidelines provide that no dredge-and-fill permit shall be issued "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 C.F.R. § 230.10(a). "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." *Id.* § 230.10(a)(2). NEPA guidelines require an EA to include brief discussions of alternatives. 40 C.F.R. § 1508.9(b). Agencies must "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E) (1988).

The Corps' EA discusses these alternatives: taking no action, increasing bypass flow, relocating the powerhouse, eliminating an excavation section and providing flushing flows to eliminate the riparian habitat loss. The Corps' alternatives analysis satisfies both CWA and NEPA requirements.

### 10. Corps' Reliance on the FERC EA

■ Lastly, Payette argues that the Corps improperly relied on FERC's EA and supplemental EA. Both EPA and FWS highlighted inadequacies in the earlier studies, upon which FERC's EAs were based. The Corps responds that it justifiably relied on the FERC documents based on a memorandum of understanding giving FERC lead agency status for environmental matters involving hydroelectric project licensing. Under the memorandum, the Corps must accept FERC's resolution of environmental issues.

We find no error in the Corps' approach. The Corps reviewed the studies and then conducted its own independent analysis of the project's environmental impacts. The Corps responded to FWS and EPA concerns by requiring HBHC to alter aspects of the project to lessen its impacts and by including specific agency concerns as conditions of the final permit. We also find significant the agencies' approval of the project and their refusal to veto the Corps' decision to issue the permit.

### B. *Characterization of Canal Wetlands*

Next, Payette argues that the Corps concluded erroneously that the canal wetlands were not within its jurisdiction for purposes of the § 404 permit process and, consequently, did not require adequate mitigation for their destruction. The district court found that because project construction had already destroyed the wetlands, the mitigation issue was moot.

### 1. Mootness

■ The Corps' "burden of demonstrating mootness 'is a heavy one.'" *County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979) (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97

L.Ed. 1303 (1953)). A controversy is moot when "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Headwaters, Inc. v. Bureau of Land Management*, 893 F.2d 1012, 1015 (9th Cir.1989) (quoting *Northwest Envtl. Defense Ctr. v. Gordon*, 849 F.2d 1241, 1244 (9th Cir.1988)). We review de novo questions of mootness. *Williams v. United States General Servs. Admin.*, 905 F.2d 308, 310 (9th Cir.1990).

▮ The district court erred in part in finding this issue moot. Payette sought an injunction to stop the project until the Corps complied with NEPA and the CWA. It did not seek to stop destruction of the wetlands. Rather, it challenged the Corps' determination that the wetlands were not within its jurisdiction. That issue became moot for NEPA purposes, *see Headwaters*, 893 F.2d at 1015, but not for CWA purposes. If the wetlands were within the Corps' jurisdiction, the § 404 permit might contain insufficient mitigation measures to compensate for wetlands loss.

### 2. Corps Jurisdiction

▮ The Corps determined that because the canal wetlands were maintained by irrigation water, they were not subject to its jurisdiction.[2] Generally, the Corps does not consider "[a]rtificially irrigated areas which would revert to upland if the irrigation ceased" as subject to § 404 permit requirements. *See* 51 Fed.Reg. 41,217, § 328.3 (1986) (discussion of public comments and changes accompanying final regulations for Corps regulatory programs). The Corps may, in its discretion and on a case-by-case basis, determine that a body of water within this category is within its jurisdiction. *Id.*

Payette has presented no evidence showing that the canal wetlands would remain wetlands if irrigation stopped.[3] The Corps'

classification of the wetlands as "non-jurisdictional" was not arbitrary and capricious. *See Citizens for Clean Air v. EPA*, 959 F.2d 839, 844 (9th Cir.1992). We also find it significant that the FERC license requires mitigation for destruction of these wetlands.

### C. Corps Process

▮ Payette maintains that the Corps' decision-making process was flawed because the Corps was racing to meet the March 12th construction deadline mandated by HBHC's FERC license. Consequently, Payette asserts, public notice was deficient, the public comment period was inadequate and the Corps abused its discretion by not holding a public hearing. We disagree.

### 1. Public Notice

The public notice provided "sufficient information to give a clear understanding of the nature and magnitude of the activity to generate meaningful comment" as required by Corps regulations. 33 C.F.R. § 325.3(a). It described the project, discussed wetlands impacts and fish habitat mitigation, and notified the public of the Corps' intent to consult with other agencies regarding potential effects on endangered species, cultural resources and water quality.

### 2. Public Comment Period

The Corps filed the notice on December 18, 1991, and, at the request of agencies and interested individuals, subsequently extended the public comment period from January 17 to January 31, 1992. This six-week period provided sufficient time for interested parties to comment.

### 3. Public Hearing

The Corps' § 404 permit regulations require it to hold a public hearing, upon prop-

---

**2.** The canal has been used as an irrigation canal since power production ended in 1954.

**3.** The record contains a January 1983 letter from Russel Manwaring, an Agriculture Department district conservationist, to Boise Cascade. Manwaring writes that *"parts* of the canal ... are wet throughout the year and may have standing water of up to 3 feet in depth." (em-

phasis added). He adds that the water comes from "various sources, such as runoff into the canal, springs, and Kennedy's (an individual with water rights to the canal) irrigation water." This does not necessarily contradict the Corps' conclusion that the area would revert to upland if irrigation ceased.

er request, "unless the district engineer determines that the issues raised are insubstantial or there is otherwise no valid interest to be served by a hearing."[4] 33 C.F.R. § 327.4(b).

The Corps received more than 250 requests for a hearing. District Engineer Volz denied one saying, "Many technical issues have been raised ... and to hold a public hearing or to further extend the comment period is not considered warranted to gather more technical data." He noted that public meetings held by HBHC and several governmental bodies and the Corps' notice adequately informed the public. Volz concluded that a hearing would be useful only as a forum to enable project proponents and opponents to air their views. He also concluded that because the Corps was aware of strong support on both sides, a hearing was unnecessary.

In light of the facts identified by Volz and his thorough analysis of all the relevant factors, we hold that the Corps did not abuse its discretion in denying requests for a public hearing.

### D. *District Court Exclusion of Extra–Record Evidence*

 Finally, Payette argues that the district court erred by refusing to admit its experts' testimony and affidavits regarding the project's effects on water quality, fisheries, bald eagles, recreation and aesthetics. We review for abuse of discretion the court's decision to exclude evidence. *Roberts v. College of the Desert,* 870 F.2d 1411, 1418 (9th Cir.1988).

Generally, review of agency action, including review under NEPA, is limited to the administrative record but may be expanded beyond the record if necessary to explain agency decisions. *Animal Defense Council v. Hodel,* 840 F.2d 1432, 1436 (9th Cir.1988). When a failure to explain action frustrates judicial review, the reviewing court may obtain from the agency, through affidavit or testimony, additional explanations for the agency's decisions. *Id.* The

extra-record inquiry is limited to determining whether the agency has considered all relevant factors and has explained its decision. *Id.* The district court may also look outside the record when the agency has relied on documents not in the record and when supplementing the record is necessary to explain technical terms or complex subject matter. *Id.*

The court excluded the testimony of 13 of Payette's 14 proposed witnesses but allowed William McDonald, the Corps employee who wrote the document, to testify about the agency's review of HBHC's application. The court did not abuse its discretion in excluding the proffered evidence. Much of it addressed concerns that the same witnesses had already raised during the public comment period. The administrative record sufficiently explained the Corps' decision and showed that the agency considered the relevant factors. No additional information was necessary for the court's review.

### III

We conclude that the district court did not err in dismissing this action. It did err in holding that whether the Corps had jurisdiction over the canal wetlands was moot. Because the Corps' decision that the wetlands were non-jurisdictional was not arbitrary and capricious, however, we need not remand for further proceedings.

We AFFIRM the district court on all issues except the mootness issue on which we REVERSE. Because Payette and Idaho Rivers are not prevailing parties, we deny their request for attorneys fees.

---

**4.** NEPA regulations require agencies to hold a public hearing when required by statutes appli-

cable to the agency. 40 C.F.R. § 1506.6(c).