**PROVO RIVER COALITION, The Stonefly Society of The Wasatch; High Country Flyfishers; The Utah Rivers Conservation Council; Zachary Frankel; Brent Feulner; Steve Schmidt; Stirling Adams; and Gary Bryner, Plaintiffs,**

v.

**Federico F. PENA, Secretary, Department of Transportation; Rodney E. Slater, Administrator, Federal Highway Administration; Michael G. Ritchie, Division Administrator of the Federal Highway Administration; and Thomas R. Warne, Executive Director, Utah Department of Transportation, Defendants.**

Civil No. 2:96–CV–186C.

United States District Court,
D. Utah,
Central Division.

May 7, 1996.

Jeffrey W. Appel, Collard, Appel & Warlaumont, Salt Lake City, Utah, James R. Wilson, Salt Lake City, Utah, for Plaintiffs.

Stephen L. Roth, United States Attorney's Office, Salt Lake City, Utah, Thomas Mitchell, Utah Attorney General's Office, Salt Lake City, Utah, for Defendants.

## MEMORANDUM DECISION AND ORDER

CAMPBELL, District Judge.

On February 29, 1996, plaintiffs filed this suit to challenge various actions taken by the Federal Highway Administration (FHWA) and the Utah Department of Transportation (UDOT) in planning and constructing a highway project in the Provo Canyon. The complaint alleges violations of the National Environmental Policy Act (NEPA), the Clean Air Act (CAA), and the Intermodal Surface Transportation Act (ISTEA). On April 8, 1996, plaintiffs filed a motion for a temporary restraining order and for a preliminary injunction, seeking to halt construction of this project pending completion of a supplemental environmental impact statement. At a hearing held on April 10, 1996, the court denied plaintiffs' request for a temporary restraining order. A hearing on plaintiffs' motion for a preliminary injunction was held over several days from April 17, 1996, through May 3, 1996. Having considered the evidence presented at that hearing, the court denies plaintiffs' motion, and enters the following findings of fact and conclusions of law:

## FINDINGS OF FACT

1. The highway project at issue in this case was originally planned as an improvement to two highway segments, Utah Route 52 (800 North in Orem, Utah) and US–189, which were to form a continuous route connecting I–15 in Orem with US 40 in Heber (the project). As originally planned, the project was to expand 800 North from two to four lanes and to improve US–189 through the canyon as a two-lane highway with passing lanes. These proposed improvements were examined in an environmental impact statement (EIS) dated October 20, 1978. The 1978 EIS acknowledged that "traffic demand" may at some point require expansion of the canyon highway to four lanes, but stated that a new EIS would have to be prepared in order to evaluate any such expansion.

2. The planned improvements to 800 North in Orem were completed in 1985. The design for the improvements to US–189 at that time had been expanded to include four lanes. On September 12, 1986, a civil action was filed (*Magleby et. al. v. Hurley, et. al.*, Civil No. 86–C–845W) seeking to enjoin further construction on the project. An injunction was issued to stop the project, and a stipulated Order was entered enjoining further work on the project (with certain exceptions) pending completion of a Supplemental Environmental Impact Statement (SEIS).

3. The SEIS was completed and approved by FHWA and UDOT in November, 1989. The project termini for purposes of the SEIS were the same as for the original EIS: the interchange between I–80 and 800 North in Orem and the intersection of US 189 and US 40 in Heber. The SEIS examined the environmental impacts of construction of a four-lane highway through the canyon. The SEIS considered several alternatives and proposed a "preferred alignment" for the highway. This preferred alignment was conceptual in nature, lacking detailed design.

4. In a Record of Decision (ROD) dated March 21, 1990, FHWA gave its approval of the proposed construction of the SEIS preferred alignment.

5. For purposes of construction, the project was split into several phases; Phase I is the portion of the highway from the intersection with 800 North at the base of the canyon to Upper Falls. Phase II is the portion of the highway from Upper Falls to the county line just above the intersection of Utah Route 92 at Wildwood. Phase III is the portion of the highway from Wildwood to just beyond the Deer Creek Dam.

6. Since the 1989 SEIS, the following steps have been taken toward completion of the project:

a. Approval for construction of Main Line Bridge over Provo River in Phase I, April 6, 1990. Construction of the bridge was completed on July 30, 1991.

b. Approval for construction of Phase I, May 31, 1991. Phase I was completed November 25, 1994.

c. Approval of contract for final design of Phase II, April 3, 1992.

d. Right-of-way acquisition for a portion of Phase II ($140,000), June 1993.

e. Right-of-way acquisition for a portion of Phase II ($480,000), July 1993.

f. Right-of-way acquisition for a portion of Phase II ($525,000), January 1994.

g. Right-of-way acquisition for a portion of Phase II ($3,600,000), July 1995.

h. Approval for construction of Phase II, September 25, 1995.

i. Construction contract for Phase II awarded, January 24, 1996.

7. During final design for Phase II and Phase III, several issues, including new geologic information and roadway geometric considerations, prompted reconsideration of some elements of the preferred alignment identified in the 1989 SEIS. The proposed designs went through several new configurations, and public hearings were held to consider these changes.

8. Proposed changes to the design of Phase II of the project were considered and evaluated in a document entitled "Re-evaluation of U.S. Highway 189 ... Final Supplemental Impact Statement Covering the Portion form Upper Falls to Wildwood, Utah County, Utah" (Phase II Re-evaluation). Proposed changes to the design of Phase III

of the project were considered and evaluated in a document entitled "Re-evaluation of U.S. Highway 189 . . . Final Supplemental Impact Statement Covering the Portion from Wildwood to Deer Creek State Park, Wasatch County, Utah" (Phase III Re-evaluation). These re-evaluations were both approved by FHWA and UDOT on July 14, 1995.

9. In the course of preparing the re-evaluations, the agencies sought input from a variety of government entities and the public. The proposed modifications were circulated to involved and interested state and federal agencies for review and comment. Public notice and opportunity for comment were provided. Public workshops were held, after publication of notice, in Heber City and in Orem in April, 1994. After publication of notice, public hearings were held in Heber on November 15, 1994, and in Orem on November 16, 1994. Newsletters regarding the project were circulated to those who had expressed an interest in the project.

10. Several new design alternatives were considered for both phases of the project as further study, public input, and budget constraints caused the designers to refine their plans. The design ultimately chosen as the preferred alignment for Phase II differed from the SEIS alignment in several ways, most notably in the redesign of the tunnel arrangement and in the substantially increased use of retaining walls. Due to new information regarding ground stability in the Hoover Slide area, the new alignment of Phase III provided for the new highway to move away from the existing highway along the river, shifting the highway up over the top of the Hoover Slide. In addition, the new Phase III alignment would cross over the top of the Deer Creek Dam instead of crossing the river on a new bridge to be constructed below the dam. The new Phase III alignment also requires that Deer Creek be re-channeled and placed in a culvert under the new highway which will be twice as long as the culvert which now runs beneath the existing highway.

**Use of Retaining Walls.**

11. Plaintiffs have estimated the length of retaining walls in the SEIS alignment for Phase II at about 1500 feet. However, the SEIS alignment was conceptual in nature, and as the design of the SEIS was refined, it was determined that the SEIS alignment would actually require about 2500 feet of retaining wall. The preferred alignment ultimately chosen in the 1995 Re-evaluation includes plans for 5,685 feet of retaining walls, which is a substantial increase no matter which estimate for the SEIS plan is used.

12. Dr. Sam Rushforth testified on behalf of plaintiffs that this increase in the length of retaining walls might have a significant effect on sedimentation rates and destruction of riparian zones, depending on the distance from the river's edge that the walls are built. However, Dr. Rushforth did not know specifics regarding the placement of the walls in the construction plans, and acknowledged that the farther from the river the walls are placed, the less significant the adverse effects would be. Dr. Rushforth also expressed concern regarding possible damage to the river due to construction but did not indicate how the risks of such damage would be increased due to the increased length of the walls. The general risks to the river from construction are considered in the 1989 SEIS, and standard mitigation measures are discussed. SEIS, pp. 4–15, 4–16.

13. Defendants presented more specific evidence regarding the placement of the walls. Edward Keane, UDOT's chief geotechnical engineer, testified that he calculated that the total riparian area in Phase II would be increased from the currently existing 3.9 acres to 6.7 acres under the current plan. Mr. Keane testified that the expanded use of retaining walls in Phase II would increase the amount of riparian area between the river and the roadway by lessening the size of the fill area needed to support the roadway. This general principle is discussed in the SEIS: "Every effort will be made during final roadway design to reduce impacts to riparian and emergent marsh habitats. Retaining walls . . . will be used to minimize cut and fill slopes in such habitats along Provo River." p. 4–24.

14. Dr. Rushforth stated that the possible danger to the river from retaining walls arises when a wall is either very close to or actually in the river. However, there is no

evidence that the walls as now planned are closer to the river than those included in the SEIS alignment. Mr. Keane testified that the walls will generally be built away from the river, and that at the closest point (station 509+50), the wall will be eight to twelve feet from the riverbank at the ordinary high water line,[1] which, according to Larry Buss, the UDOT project engineer, would result in 25 to 50 feet of wall being in the river for short periods during periods of very high flow in the river. In general, the current Phase II alignment moves the road through the narrows section of the canyon "between about 20 and 40 feet further into the hillside [than the SEIS alignment] . . . to provide additional clearance between the roadway and the Provo River." Phase II Re-evaluation, p. 12. Mr. Keane testified that the impacts to the river from the current design would be less than those arising out of the SEIS alignment, which allowed for wall construction in the river.

15. The court finds that although the total length of the walls has substantially increased, there has been no evidence to indicate that this design change has increased the risk of environmental harm to the river. Plaintiffs' expert testified that increasing the length of retaining walls in or near the river could have significant effects, but acknowledged that he had no knowledge regarding the placement of walls in the current plans. The only evidence presented on the placement of the walls indicates that the walls will be shifted farther from the river, and that the increased length of the walls will have an overall positive environmental effect, as a result of the increased riparian area, and due to the limited access to these environmentally sensitive areas.[2]

**Waste Disposal Site.**

16. The 1989 SEIS did not specify a particular site for placement of excess material excavated in construction, but listed several alternatives and stated that the contractor would be required to comply with all permit requirements and prepare a reclamation plan

prior to using any site. One of the possibilities considered in the SEIS was the Bureau of Reclamation Borrow Pit located at Weeks Bench below Deer Creek Dam. During the design of Phase II, plans were made to dispose of excess fill at the River Bend Trailer Park at the lower end of Phase II, but it was later determined that it would be preferable to place the fill at Weeks Bench, as a large amount would be required in that area to construct Phase III.

17. Plaintiffs allege that the current plans for disposing of excess fill material at the Weeks Bench area is a substantial change to the project which requires a supplemental EIS. However, the 1989 SEIS considered Weeks Bench as a possible disposal site. The environmental effects of using Weeks Bench are briefly addressed there with the observation that Weeks Bench has already been disturbed as a borrow pit for construction of the Deer Creek Dam and remains unvegetated. SEIS, p. 4–2. The environmental consequences of using this, or any other site, are also addressed in the SEIS by the general statement that "[t]he contractor will also be required to prepare and submit evidence of compliance with federal and state environmental law and assurance of compliance with state and local government permits as well as prepare a reclamation plan prior to using any site" as a waste disposal area. *Id.* The implication of this provision is that if the required mitigation measures are taken, there will be no adverse environmental consequences that would require analysis at that stage.

18. The permits required for use of the Weeks Bench area contain detailed mitigation measures that the U.S. Army Corps of Engineers would supervise. In addition, the agreement between UDOT and the Bureau of Reclamation (upon whose land the Weeks Bench site is located) requires that "upon completion of the work, the construction site and any disturbed areas shall be smoothed and graded in a manner to conform to the natural topography of the landscape and

---

1. The ordinary high water line is the spot at which permanent vegetation grows along the riverbank due to the fact that the ground above the line is generally out of the water.

2. Mr. Keane testified that 30% of the riparian zone is currently destroyed due to steady pedestrian traffic and automobiles parking off the side of the road.

shall be repaired, replanted, reseeded or otherwise restored comparable to original condition." Agreement for Relocation of Highway and Future Exchange of Deeds Between the United States of America and UDOT, Exhibit P at p. 6, ¶ 12. Dan Fritz of the Bureau of Reclamation testified that the site at Weeks Bench would actually be improved by the proposed action.[3]

**The Haul Road**

19. In the 1995 Re-evaluations the agencies determined that a haul road would have to be constructed to move the excess fill up the canyon to Weeks Bench in order to avoid using the existing highway for that purpose. The route for the haul road was planned along the alignment designed for Phase III. Since the haul road was to be constructed within the "footprint" of Phase III, it was thought that it would be immediately improved to a paved highway. The Re-evaluations assumed that the haul road would have no environmental effects other than those considered in the analysis of the Phase III design. Therefore, no additional evaluation was done to analyze the consequences of building the haul road. Phase III Re-evaluation, p. 4–17.

20. At some point, it was determined that Phase III construction would be delayed indefinitely due to funding issues. As a result, the haul road to be constructed along the Phase III alignment will not be improved to a paved highway for several years. In light of the fact that it now appears that construction of Phase III will be delayed indefinitely, the environmental effects of the haul road must be considered independently. Plaintiffs argue that the agencies have failed to analyze whether this substantial construction effort would have any significant environmental effects. However, since the haul road is now planned as a temporary structure to aid in Phase II construction, the court must consider the mitigation measures for such construction disturbances considered in the 1989 SEIS (*see, e.g.,* SEIS pp. 4–16, 4–78), and the mitigation plans actually put in place for this structure.

21. Plaintiffs' expert witness, Elliot Lips, a geotechnical engineer, testified that environmental consequences of the haul road have not been considered due to the fact that the road was designed as a temporary structure. He noted the steeper cut slopes, the lower factor of safety, and the failure to consider seismic loading. Mr. Lips also testified concerning erosion effects of leaving the haul road as a permanent structure, since the slope stabilizing measures planned for Phase III would not be implemented for the haul road. All of the adverse effects to the environment cited by plaintiffs assume that the haul road would be left unmitigated. Mr. Lips conceded, however, that he had not examined the mitigation plans for the haul road which had been put into the contract specifications.

22. Larry Buss, the project engineer, testified that there will be an on-site visit by geotechnical engineers after the haul road is no longer in use. This visit will be used to determine what measures will be necessary to permanently reclaim and stabilize the road, including possible laying back or backfilling of the cut slopes, which is one of the mitigation methods identified by Mr. Lips. Detailed plans for mitigation of the haul road have also been incorporated into the contract specifications.

**New Legislation**

23. Plaintiffs claim that the passage of the Central Utah Project Completion Act (CUPCA) constitutes a changed circumstance which requires supplementation of the EIS. Dr. Rushforth testified on behalf of plaintiffs that he believes flows in the Provo River would increase as a result of CUPCA. This testimony was confirmed by David Fritz of the Bureau of Reclamation, who stated that CUPCA provided for minimum flows of 85

---

**3.** There is a question as to the amount of fill to be disposed at the Weeks Bench site. The SEIS states that the site is capable of accommodating 400,000 cubic yards of material. SEIS, p. 4–2. Larry Buss testified that the total amount of fill material to be moved in Phase II is 588,752 cubic yards, and that 500,000 to 600,000 cubic yards of material would be required in order to construct Phase III as it passes over the Weeks Bench area. In any event, Lee Abramson, a geotechnical engineer working with an agency consultant on the project, testified that the Weeks Bench area would be sufficient for disposal of all excess fill generated in Phase II.

cfs in order to maintain the fishery, and an increase of minimum flows in the river to 100 cfs in the future. Mr. Fritz also testified, however, that such an increase in flows would not have any significant effect on the project. The court finds that there is no evidence that such an increase of the minimum flows in the river could cause significant environmental effects arising out of this project.

24. Plaintiffs claim that the designation of the Provo–Orem municipal area as nonattainment for ozone and CO and Utah County for PM10 requires a new consideration of air quality issues. The air quality analysis done in connection with the SEIS examined air quality "secondary impacts" on 800 North in Orem and on University Avenue in Provo based on projected increases in vehicle miles traveled into those areas from improvement of the highway from existing condition to two or four lanes. SEIS at 4–64. Plaintiffs have not submitted any evidence of unanticipated changes in the air quality since the SEIS which would show that the analysis of air quality issues in the SEIS is inadequate.

## CONCLUSIONS OF LAW

■ 1. Plaintiffs bear the burden in this case of establishing the need for injunctive relief. In making its determination regarding the necessity of the injunction, the court must consider four factors: (a) whether plaintiffs have shown a substantial probability of success on the merits; (b) whether plaintiffs are threatened with irreparable injury in the absence of an injunction; (c) whether plaintiffs' potential injury outweighs any damage to defendants; and (d) whether the injunction would be adverse to the public interest. *Potawatomi Indian Tribe v. Enterprise Management Consultants, Inc.*, 883 F.2d 886, 888–89 (10th Cir.1989); *Lundgrin v. Claytor*, 619 F.2d 61, 63 (10th Cir.1980). If plaintiffs are able to show that they will suffer irreparable injury and that "the balance of hardships tips decidedly in [their] favor," the requirement of showing a substantial probability of success on the merits is satisfied by raising "questions going to the merits so serious, substantial, difficult and doubtful as to make them a fair ground for litigation and thus for more deliberate inqui-

ry." *Lundgrin,* 619 F.2d at 63 (*quoting Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 781–82 (10th Cir.1964).

### Irreparable Injury

■ 2. Early in the hearings on this matter, it became clear that the scope of the issues to be considered for injunctive relief would be limited by the fact that Phase III of this project has been postponed indefinitely, and thus there is no imminent risk of injury to plaintiffs from Phase III construction. In light of this, the evidence was limited to facts relevant to the ongoing construction of Phase II, including the haul road and the fill site at Weeks Bench.

3. Plaintiffs assert that there is irreparable injury due to the continued construction efforts in the canyon, which defendants conceded would involve earth movement and blasting that would be essentially irreversible. The construction also involves removal of substantial amounts of vegetation and the diversion of Deer Creek. Although there is no presumption of irreparable injury, this sort of permanent alteration to the environment of an area such as Provo Canyon is the type which is generally held to be sufficient to constitute irreparable injury for purposes of preliminary injunctive relief. *See Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 1404, 94 L.Ed.2d 542 (1987). In view of the ongoing construction, the court finds that plaintiffs will suffer irreparable injury prior to final resolution of this case. In addition, the alleged violations of NEPA are themselves irreparable since the purpose of NEPA is to ensure that the agency and the public is aware of environmental consequences of a project before construction commences. *Sierra Club v. Hodel,* 848 F.2d 1068, 1097 (10th Cir.1988); *Sierra Club v. Marsh,* 872 F.2d 497, 503–04 (1st Cir.1989).

### Balancing of Harms—Public Interest

■ 4. In this case, the interests of both plaintiffs and defendants coincide with different elements of public interest; plaintiffs are asserting the interest of the public in compliance with NEPA, and defendants assert the public interest in the funds already expended on the project and the funds that would be

spent in necessary reclamation of areas already disturbed by construction should an injunction issue. There is also a public interest in the asserted increased safety, efficiency, and environmental protections alleged to be provided by the project. In general, courts have found that the public interest in requiring NEPA compliance prior to a project proceeding is sufficient to justify an injunction. *Southern Utah Wilderness Alliance v. Thompson*, 811 F.Supp. 635, 641 (D.Utah 1993); *Realty Income Trust v. Eckerd*, 564 F.2d 447, 456 (D.C.Cir.1977). However, there is no general presumption that an alleged NEPA violation will in all cases outweigh other public interests. *See Fund for Animals, Inc. v. Lujan*, 962 F.2d 1391, 1400 (9th Cir.1992); *Concerned Citizens, etc. v. Secretary of Transportation*, 641 F.2d 1, 7–8 (1st Cir.1981); *Thompson*, 811 F.Supp. at 641.

5. The defendants argue that, in this case, the balance should shift in favor of denial of plaintiffs' motion due to the significant public funds expended thus far in final planning and construction. Defendants have submitted evidence that stopping the project now would cost $32,950.00 per day in construction standby costs. The project engineer testified that it would take two months of construction in order to mitigate the effects of construction already done on the project, and that cancellation of the contract would cost from five to ten million dollars. In addition, any delay to the project beyond two weeks will likely postpone completion of the project for four to six months due to winter construction delays.

6. Defendants also argue that the court must consider the important public interests cited in the 1989 SEIS in support of the need for this project, including the unusually high accident rate on the highway as it is currently configured. Defendants contend that any delay to this project presents risks to the public safety due to the inability of the existing highway to accommodate current traffic levels. The SEIS indicates that the project is intended to correct deficiencies in the current highway which result in extremely high accident rate, from 40% to 80% higher than those of comparable roads in Utah. See

SEIS, pp. 1–2, 1–3. Defendants also presented testimony citing risks to the Provo River from possible accidents involving trucks carrying hazardous materials. Affidavit of Larry Buss, p. 6.

7. The court also notes that the construction area is already substantially disturbed. The new construction of Phase II generally follows the route of the existing highway, and the proposed haul road runs through an area where roads and a housing subdivision already exist. The proposed fill site at Weeks Bench is located on land that was previously disturbed during construction of Deer Creek Dam, and the testimony indicated that Deer Creek was long ago altered to run outside of its original course. Plaintiffs point to Provo Canyon's natural beauty and resources, including the use of the Provo River for fishing and other recreational activities. On the other hand, defendants have submitted evidence to show that the project is intended in part to preserve and even to enhance and protect the natural resources that plaintiffs cite. Although the effects of such mitigation efforts in the context of this project are exactly the sort of things that plaintiffs are seeking to verify through NEPA processes, the court may also consider evidence of defendants' mitigation efforts in order to assess the risks of harm, an assessment which is necessary in order to balance the interests at stake here. *See Fund for Animals, Inc.*, 962 F.2d at 1400 ("In cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiffs.").

8. Having carefully considered all of these factors, the court finds that the harm cited by defendants is outweighed by the potential irreversible harm to the canyon environment and to the public's interest in having agency decision makers consider all the relevant information which NEPA requires. However, this is not a case in which that balance "tips decidedly toward plaintiff." *See Potawatomi Indian Tribe*, 883 F.2d at 888–89; *Thompson*, 811 F.Supp. at 641.

**Likelihood of Success on the Merits/Fair Grounds for Litigation**

9. Plaintiffs allege that the defendant agencies have violated NEPA and various

regulations associated with it. Plaintiffs assert that changes in the surrounding circumstances, changes to the nature of the project, and new information which has been developed since the 1989 SEIS was approved require that the agencies prepare a new supplemental EIS.

*Scope of Review*

■ 10. The purpose of NEPA is to require agencies to compile and consider all relevant information before taking action which might have significant environmental effects. This is an ongoing duty which does not end when an initial EIS is prepared. Rather, there are circumstances in which an agency will be required to supplement an EIS. The regulations promulgated by the Council on Environmental Quality (CEQ) provide that supplements must be prepared if there are significant changes made to a project which are relevant to environmental concerns, or if there are significant new circumstances or information relevant to environmental concerns. 40 C.F.R. § 1502.9. In addition, the FHWA regulations require that the agency supplement an EIS whenever it determines that:

(1) Changes to the proposed action would result in significant environmental impacts that were not evaluated in the EIS; or

(2) New information or circumstances relevant to environmental concerns and bearings on the proposed action or its impacts would result in significant environmental impacts not evaluated in the EIS.

23 C.F.R. § 771.130(a). However, if the changes to the project or the new information result in a lessening of adverse environmental impacts, without causing other significant environmental impacts, no supplemental EIS will be required. 23 C.F.R. § 771.130(b)(1).

■ 11. The court's review of the agencies' decision that the circumstances did not require a supplemental EIS under these regulations is a limited one. In *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1988), the Court established the scope of judicial review of an agency decision not to prepare a supplemental EIS. The court held that under the provisions of the Administrative Procedure Act, 5 U.S.C. § 706, a challenge to an agency decision regarding the significance of alleged changes is "a classic example of a factual dispute the resolution of which implicates substantial agency expertise." *Marsh,* 490 U.S. at 376, 109 S.Ct. at 1861. "Accordingly, as long as the [agency] decision not to supplement the [1989 SEIS] was not 'arbitrary or capricious,' it should not be set aside." *Id.* at 377, 109 S.Ct. at 1861. The court's responsibility in this case is to review the record and satisfy itself that "the agency has made a reasoned decision based on its evaluation of the significance—or lack of significance—of the new information [or circumstances]." *Id.* at 378, 109 S.Ct. at 1861.

■ 12. Plaintiffs contend that the court's review of whether the defendants took the required "hard look" at the possible environmental impacts resulting from changes to the project since the SEIS is confined to "the administrative record" existing at the time the decision was made to proceed with Phase II of the project. Plaintiffs claim that all other evidence, including contracts, plans, specifications and all documents which were created after the 1995 Re-evaluations must not be considered by the court. According to plaintiffs, with this evidence defendants "are attempting to justify their actions with post hoc rationalizations and evidence." Plaintiffs' Memorandum in Support, p. 4. The court agrees that its review of the decision to proceed with Phase II of the project must focus on the procedures that were followed until the date of the publication of the 1995 Re-evaluations. However, the contracts, specifications, plans, and other evidence received at the hearing must be considered in order to evaluate the environmental consequences of the project. The environmental analysis of the SEIS and the 1995 Re-evaluations assumed that these measures would be taken, so it is appropriate for the court to examine the details of the mitigation and construction plans in considering whether the consequences of the construction are something other than was assumed at the time of the earlier documents. The court's review of agency actions simply cannot be limited to documents generated in NEPA compliance; the agency's duty is to constantly evaluate

their project to consider whether new significant developments have occurred which may have environmental effects. However, it is clear that "an agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made." *Marsh,* 490 U.S. at 373, 109 S.Ct. at 1859.

*Status of the 1995 Re-evaluations*

13. Plaintiffs challenge the sufficiency of the 1995 Re-evaluations which set out new alignments and plans for Phase II and Phase III, arguing that these documents are insufficient to comply with the agencies' obligations under NEPA and FHWA regulations. 23 C.F.R. § 771.129(b), entitled "Re-evaluations" provides:

> A written evaluation of the final EIS will be required before further approvals may be granted if major steps to advance the action (e.g., authority to undertake final design, authority to acquire a significant portion of the right-of-way, or approval of the plans, specifications and estimates) have not occurred within three years after the approval of the final EIS, final EIS supplement, or the last major Administration approval or grant.

Plaintiffs argue that defendants were required to conduct a formal re-evaluation of the project, and claim the 1995 documents do not fulfill this requirement.[4] However, the evidence clearly establishes that within three years of the agencies' approval of the SEIS, major steps were taken to advance the project, including actual construction work on Phase I, and approval of final design authority for Phase II.

4. Plaintiffs point to language in the Phase III Re-evaluation which states that "the FHWA has requested that a Re-evaluation of the SEIS be prepared for each remaining segment of [the project]," because there had been "no major steps to advance the action" since the approval of the SEIS. However, the testimony indicated that this statement was drafted by the contractor who prepared the Re-evaluation, and was overlooked in the agencies' review process. There is

14. It is true, however, that regardless of the status of the 1995 Re-evaluations as NEPA documents, the agencies are required to constantly evaluate their project to determine whether changes to the circumstances or to the plans are significant enough to require supplementation of the EIS. 23 C.F.R. § 771.130(a).

*Project Scope*

15. Plaintiffs question the scope of the project as outlined in the original 1978 EIS and as considered in the 1989 SEIS. According to plaintiffs, defendants have failed to consider the "true scope" of the project by limiting the project to I–15 to Heber. Because the highway will be connected to US–40 in Heber, which provides a direct connection north to I–80, plaintiffs argue that the project creates a "shortcut" from I–80 to I–15 which bypasses Salt Lake City and which will increase the use of the project by interstate traffic. Plaintiffs point to the 1995 Re-evaluation of Phase III, which acknowledges that this connection to I–80 will create a shortcut, and argue that with the completion of improvements to US–40 making it a four lane highway, increased interstate traffic is inevitable.

■ 16. In order to properly evaluate the environmental consequences of a proposed action, the agency must determine a logical scope for the evaluation. FHWA regulations require that any action evaluated in an EIS shall:

> (1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

> (2) Have independent utility or independent significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and

no evidence that this misstatement was relied on by plaintiffs or the public in any relevant way that "threatened to work serious injustice," nor that it involved "affirmative misconduct" rather than simple oversight, both of which are required to justify a finding of estoppel against the government. *See Heckler v. Community Health Services,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984).

(3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

23 C.F.R. § 771.111(f). Thus, defendants are to evaluate the environmental effects of their actions by considering them within a reasonable context. "Agencies may not evade their responsibilities under NEPA by artificially dividing a major federal action into smaller components, each without 'significant' impact." *Coalition on Sensible Transportation, Inc. v. Dole,* 826 F.2d 60, 69 (D.C.Cir. 1987). However, the court's review of the agencies' determination of the proper scope of this project is confined to considering whether the scope of their inquiry is so improperly limited as to be arbitrary or capricious.

17. In this case, the project connects reasonable destinations, and is sufficient in length to consider environmental impacts on a reasonably broad scope. In addition, the project as defined in the EIS and SEIS appears to have independent utility. "The proper question is whether one project will serve a significant purpose even if a second related project is not built." *Id.* at 69. In this case, the development of US–40 as a four-lane highway connecting the project to I–80 certainly appears to increase the utility of the project, but even if there were no such connection to I–80, this project would have independent utility in providing access to various destinations within Provo Canyon, Heber, Kamas, Jordanelle Reservoir, Park City, and the Uinta Basin. This is a far cry from plaintiffs' characterization of the project as "a road going nowhere."

18. Plaintiffs have made the argument that defendants did not consider the impacts to the project arising out of the connection to I–80, but have presented no evidence as to the significance of any increase in traffic due to the existence of the shortcut, and no evidence as to significance of the environmental effects of such an increase. The 1989 SEIS considered the fact that the improvements to US–189 and its connection to the planned improvements to US–40 in Heber would create an alternate route for interstate traffic. Plaintiffs have not submitted any evidence which would justify a finding that the pro-

ject's connection to I–80 might have significant environmental effects not already considered in the 1989 SEIS.

*Changes in Road Alignment*

19. As indicated above, the court finds that the changes to the road alignment made in the design for Phase II do not constitute such a significant change which would render the agencies' determination that a supplemental EIS is not needed arbitrary or capricious.

*Use of Weeks Bench Disposal Site*

20. Although the SEIS does not provide details of mitigation efforts to be undertaken at the site, such are not required. The Supreme Court stated in *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 351, 109 S.Ct. 1835, 1847, 104 L.Ed.2d 351 (1989) that "[t]o be sure, one important ingredient of an EIS is the discussion of steps that can be taken to mitigate adverse environmental consequences." The Court then recognized that:

> There is a fundamental distinction, however, between a requirement that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated, on the one hand, and a substantive requirement that a complete mitigation plan be actually formulated and adopted, on the other.... it would be inconsistent with NEPA's reliance on procedural mechanisms—as opposed to substantive, result-based standards—to demand the presence of a fully developed plan that will mitigate environmental harm before an agency can act.

*Id.* at 352–53, 109 S.Ct. at 1847. Indeed, in *Friends of the Payette v. Horseshoe Bend Hydroelectric Co.,* 988 F.2d 989 (9th Cir. 1993), the court upheld an environmental assessment even where some environmental impacts would inevitably occur, on the basis that "[i]f significant measures are taken to 'mitigate the project's effects,' they need not *completely compensate* for adverse environmental impacts." *Id.* at 993–94 (*quoting Preservation Coalition, Inc. v. Pierce,* 667 F.2d 851, 860 (9th Cir.1982). The 1989 SEIS contemplates that mitigation efforts will be undertaken with regard to such fill sites, and

plaintiffs have not shown that there may be significant environmental effects that have not been accounted for in the mitigation plans.

*Construction of the Haul Road*

21. Plaintiffs allege that the plan for construction of a haul road to carry excess fill from Phase II to the disposal site at Weeks Bench is a change to the project that may have substantial environmental effects not considered in the 1989 SEIS, especially in light of the fact that the haul road will be left undeveloped. However, the testimony established that the haul road would be reclaimed and that the possible environmental effects claimed by plaintiffs would be mitigated once the road is no longer used. Plaintiffs' argument that these efforts are insufficient because they are in plans developed after the 1989 SEIS and even subsequent to the approval of the 1995 Re-evaluations misses the mark. Although mitigation and reclamation of this particular haul road could not have been considered in these documents, the possible impacts of road construction in general was certainly foreseen and considered by the agencies in the 1989 SEIS, which incorporated by reference the standard construction mitigation requirements set out in UDOT Standard Specifications. As indicated above, the specifics of the mitigation plans are not required to be set out in a NEPA document, and although the timing of the construction of Phase III has changed since the 1995 Re-evaluations, the effects of that change are considered and accounted for in the later mitigation plans. Plaintiffs have not pointed to any significant environmental effects which might be left unmitigated by the haul road plans.

*CAA and ISTEA*

22. Since the completion of the SEIS, Congress has enacted the 1990 amendments to the Clean Air Act (CAA) and the Intermodal Surface Transportation Act of 1991 (ISTEA). The regulations adopted in 1993 pursuant to the CAA amendments contain a "grandfather" provision that exempts projects for which the NEPA process has been completed if major steps have been taken within the past three years toward completion of the project. 40 C.F.R. § 51.394(c)(1).

The court finds that such major steps have been taken on this project, and that there has been no significant change in the project's design, concept and scope. *See* 40 C.F.R. § 51.394(c)(2). Accordingly, a new conformity determination for this project is not required under these statutes.

23. In light of the above analysis, the court finds that plaintiffs have so far failed to come forward with any evidence of significant environmental effects arising out of the project as currently planned which have not been considered in the SEIS, or which have not been accounted for in the mitigation plans that the SEIS assumed would be undertaken. The court finds that the agencies have adequately evaluated the environmental consequences arising out of the changes to the project, and that their decision not to prepare a supplemental EIS is not arbitrary or capricious. Accordingly, plaintiffs have failed to meet their burden of showing a likelihood of success on the merits, or even that there is a fair ground for litigation on the issues they have raised. Plaintiffs' motion for a preliminary injunction is therefore DENIED.

IT IS SO ORDERED.